**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DWAYNE HARVARD**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-505 |
| | ) | |
| **CHRISTOPHER J. CESNALIS** | ) | |
| *Individually and* **DANIEL L. BEATTY** | ) | |
| *Individually,* | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

**I.      Introduction**

This case arose from a bizarre incident in which the plaintiff, Dwayne Harvard ("Harvard"), drove for ten miles, at highway speed, with a man on the hood of his car.  Pending before the court is a motion for summary judgment (ECF No. 34) filed by defendants Christopher J. Cesnalis ("Cesnalis") and Daniel L. Beatty ("Beatty"), the Pennsylvania state troopers who arrested and pressed charges against Harvard.  The concise statements of material fact ("CSMF") are thoroughly developed and motion is fully briefed and ripe for disposition.

**II.      Factual Background**

At the summary judgment stage, the facts must be construed in the light most favorable to Harvard, the nonmoving party.  The factual summary is taken largely verbatim from Harvard's proposed additional statement of material facts (*see* Parties' Joint CSMF, ECF No. 46 at ¶¶ 26-97).  The court will provide citations to the record where it has modified or supplemented these facts.

On April 19, 2015, the date of the incident, Harvard was acting as a good Samaritan. He was driving his vehicle in New Kensington, Pennsylvania, when he was flagged down by Anna Mazzetti ("Mazzetti"), who was outside a convenience store. That day was the first time Harvard met or encountered Mazzetti. Mazzetti was in distress and asked Harvard for a ride home. Harvard agreed to help Mazzetti and drove her straight to her residence in Springdale Township, Pennsylvania, located approximately 15 minutes from the convenience store. Harvard is an African-American male (CSMF ¶ 1) and Mazzetti is a white woman. (Police Report, ECF No. 37-4).

Shortly after arriving at Mazzetti's residence, her boyfriend, Steven Sutton ("Sutton"), a white male (CSMF ¶ 6), exited the residence and approached Harvard's vehicle in a hostile manner. Sutton was yelling at Mazzetti, making threats and trying to get Mazzetti out of the vehicle. Sutton tried to open the passenger side door, but it was locked. Harvard rolled down his window slightly and attempted to talk to Sutton. Sutton called Harvard "nigger" multiple times. Sutton proceeded to pick up a cinder block, cocked his arm back and threatened to throw the cinder block through Harvard's vehicle's windshield. Because of Sutton's actions, Harvard was in fear of severe bodily harm for Mazzetti and himself. Harvard tried to calm Sutton by asking him to put the cinder block down.

Despite Harvard's urgent pleadings, Sutton became more aggressive. Sutton told Mazzetti that he would "chop her up" and brandished a large kitchen knife approximately 12 inches long and 2 inches thick. Sutton threatened to kill Mazzetti and Harvard. Sutton said to Harvard, "you big black nigger, you stay right there I got something for you." (ECF No. 46 ¶ 40). Sutton then told Harvard that he was going to shoot him. Sutton entered the residence, and

Harvard, believing Sutton to be a threat, called 911. While Sutton walked toward the residence, Harvard drove forward out of Mazzetti's driveway in fear for Mazzetti's safety and his safety.

Soon thereafter, Sutton reemerged from the residence and jumped on the hood of Harvard's vehicle. Harvard did not hit Sutton with his vehicle; rather, Sutton jumped onto the vehicle and held onto the hood of Harvard's vehicle.

After traveling approximately 15 yards, Harvard slowed his vehicle to allow Sutton to safely remove himself off the hood. Sutton remained on the hood of Harvard's vehicle. While Sutton was on the hood of the vehicle, he continued to threaten to kill Harvard, yelling "I'm going to kill you, nigger." (ECF No. 46 ¶ 45). Harvard responded by telling Sutton that he was going to slow his vehicle down to allow Sutton to remove himself off the hood. When Harvard slowed his vehicle to let Sutton off, Sutton began pounding on the hood of the vehicle. During this incident, Harvard noticed a bulge in Sutton's waistband, which Harvard believed to be a firearm and caused him further worry for Mazzetti's safety and his safety.

Harvard remained on the phone with a female 911 operator throughout this incident. Harvard informed the 911 operator that Sutton was located on the hood of Harvard's vehicle, and that he was making threats of bodily harm to Harvard and Mazzetti. The 911 operator originally provided no instructions. Harvard Deposition at 37. Harvard drove through Springdale Township down to Freeport Road, into Harmar Township past the Harmar Township police station, and got onto Route 28 northbound at exit 11 (Harmarville).[1] (Incident Report, ECF No. 37-7). Sutton discarded his knife in Springdale, prior to entering the highway, and ripped the windshield wipers off Harvard's vehicle on Route 28. Harvard Deposition at 38.

When Harvard informed the 911 operator that he was near Exit 14, the operator

---

[1] Mazzetti testified that she told Harvard to go directly to a police station, but Harvard was totally freaking out because every time he stopped the car Sutton threatened to kill him. Mazzetti Deposition at 21. Harvard drove past the Harwick police station before getting onto Route 28. Mazzetti Deposition at 35.

instructed Harvard to drive to and get off at Exit 15, where law enforcement officers would be waiting for them. The 911 operator never instructed Harvard to stop while he was driving on State Route 28. While talking with the 911 operator, Harvard requested assistance from law enforcement officers before and after entering onto the highway. During this time, Harvard continued to inform the 911 operator about Sutton's verbal attacks and aggressive behavior, including, but not limited to, Sutton reaching into his waistband where Harvard believed that Sutton had a firearm. Harvard believed that the 911 operator informed law enforcement about Sutton's prolonged and violent attack on the Harvard.

Harvard drove on State Route 28 for approximately ten miles, with Sutton on the hood of his car. CSMF ¶ 9. Harvard drove as fast as the speed limit allowed, if not faster. CSMF ¶ 10.

Harrison Township police officer Justin Bouch ("Bouch") was contacted by the dispatcher. (Police Report, ECF No. 37-3).[2] While on Burtner Road, heading toward exit 15 of Route 28, he observed a silver SUV heading toward him with a man on the hood, face down, holding onto the windshield wipers. He activated his lights and sirens.

As instructed by the 911 operator, Harvard exited State Route 28 at exit 15. While exiting the highway, Harvard saw Sutton discard an item, which Harvard believed to be a firearm. Harvard exited the highway and followed the 911 operator's instructions to where he was to meet the law enforcement officers. Harvard stopped his vehicle in front of several law enforcement officers, who were blocking the road. The officers had their firearms drawn and pointed at Harvard's vehicle.

Bouch ordered the male on the hood of the car (Sutton) to get on the ground. (Police Report, ECF No. 37-3). Harvard and Mazzetti were ordered out of the vehicle with their hands

---

[2] Plaintiff admitted that this information is contained in the police report (ECF No. 46 ¶ 13). Plaintiff stated that he "will likely seek to have these facts excluded at trial," but provided no reason to do so. *Id*.

in the air.  *Id*.  At this time, Harvard was still on the phone with the 911 operator and was directed by one of the officers to put the phone down. All suspects were held at gunpoint until backup arrived.  *Id*.  When backup arrived a few seconds later, Bouch handcuffed Sutton and placed him in the back of his patrol car.  *Id*.  Harvard did not observe Sutton being handcuffed at any point.  (ECF No. 46 ¶ 79).

Cesnalis, a Pennsylvania state trooper, was contacted by the Pennsylvania State Police dispatcher and told that there was a man on the hood of a vehicle traveling north on Route 28. Cesnalis Deposition at 13.  Cesnalis was informed by dispatch that Harvard had called 911 and reported that he feared for his safety. Cesnalis arrived on the scene after the car was stopped by the local police and Sutton was in the police car.  Cesnalis Deposition at 27.

After Harvard put his phone down, Cesnalis approached Harvard and asked him if he had been drinking. Cesnalis smelled alcohol and Harvard was talking in a rapid manner.  Cesnalis Deposition at 32.  Harvard informed Cesnalis that he had two beers approximately four hours before.  Harvard tried to explain Sutton's hostile and violent conduct and the events previously described, but Cesnalis refused to listen to Harvard. Instead, Cesnalis kept repeating to Harvard that Harvard had been drinking. Harvard reiterated that he had only two beers and that he was fine.

Cesnalis had Harvard perform a Breathalyzer test. (Incident Report, ECF No. 37-7). Cesnalis said to Harvard, "You understand me boy, I want you to blow into the Breathalyzer." CSMF ¶ 70 (citing Harvard's Deposition at 54).[3]  During Harvard's attempts at the Breathalyzer test, Cesnalis yelled at Harvard, called him "boy" and threatened to handcuff him. After six attempts, Harvard was able to perform and pass the Breathalyzer test.  (Incident Report, ECF No. 37-7).  Harvard's blood alcohol content, according to the Breathalyzer, was 0.64, which is below

---

[3] Cesnalis denies calling Harvard "boy."  Cesnalis Deposition at 139.

the legal limit of 0.8. Cesnalis believed that Harvard was under the influence of stimulants or narcotics because he was sweaty, speaking too rapidly and not directly answering questions, as well as the nature of the incident. Cesnalis Deposition at 65.

Harvard told Cesnalis that he feared for his safety and thought Sutton had a weapon. Harvard stated to Cesnalis: "[Sutton] got on the hood of my car. I was scared for my life." CSMF 66. Harvard informed Cesnalis that Sutton had a large knife and that he kept reaching for his waistband where Harvard believed he kept a firearm. There was no effort made by law enforcement to attempt to find the knife described by Harvard. Cesnalis asked Harvard whether it was a windshield wiper rather than a knife, which Harvard denied. (Incident Report, ECF No. 37-7). Without an explanation as to why, Cesnalis chose not to believe Harvard regarding Sutton's knife.

Cesnalis interviewed Sutton at the scene regarding the incident. Sutton told Cesnalis that he was hit by Harvard's vehicle and that he had landed on top of the car. At the time, Cesnalis found that Sutton's statement did not make sense, but Cesnalis did not question Sutton further as to how he landed on top of the vehicle. Sutton was transported to the station in a police cruiser, but was not arrested or charged. (Police Report, ECF No. 37-3). Cesnalis spoke with Beatty about charging Sutton. Cesnalis Deposition at 72. Cesnalis did not consider Sutton's rap sheet, but was aware of him from past police incidents. Cesnalis Deposition at 41.

Cesnalis interviewed Mazzetti at the scene regarding the incident. Mazzetti informed Cesnalis that Sutton was crazy, he had a cinder block and came toward the vehicle, she was afraid to get out of the vehicle and Harvard slowed his vehicle down a few times to give Sutton the opportunity to get off, but Sutton refused to get off. Prior to talking to Mazzetti, Cesnalis had already decided that he was going to charge Harvard with crimes. Cesnalis concluded that he

was going to charge Harvard with crimes because Harvard drove through a whole bunch of different towns and Route 28 with a man on the hood of his vehicle. Cesnalis Deposition at 77.

Harvard was handcuffed and told that he was being taken to the barracks "for safety reasons." CSMF ¶ 74. Cesnalis intended to have a drug evaluation performed. Harvard was transported to the state police barracks where he was further interrogated by Cesnalis, who was joined by Beatty, a Pennsylvania state trooper who was a Drug Recognition Expert ("DRE"). CSMF ¶¶ 3, 84. Harvard again tried to explain the incident to Cesnalis, i.e., that Sutton had a weapon and was threatening Harvard and Mazzetti, but Cesnalis refused to listen to Harvard.

Beatty ran a series of tests to determine whether Harvard was under the influence of drugs or alcohol. Harvard's blood alcohol level at the time of the examination was 0.51. (ECF No. 37-7 at 15). In his "Drug Influence Evaluation," Beatty reported that Sutton told Cesnalis he witnessed Harvard smoking crack cocaine in his vehicle during the incident. (ECF No. 37-7 at 15). There is no evidence in the record, besides this report, corroborating this statement attributed to Sutton. During the examination, Beatty accused Harvard of being on cocaine.

Beatty recorded the following observations of Harvard: his attitude was cooperative, his coordination seemed poor, no distinct odors were observed, his face was sweaty, he was very talkative, his eyes were bloodshot and watery, his pulse was substantially higher than normal, and there was a lack of smooth pursuit during the horizontal gaze nystagmus. (ECF No. 37-7 at 17). Harvard had some problems with the walk and turn test and one leg stand. (ECF No. 37-7 at 18). Beatty opined in the report: "As an IACP certified Drug Recognition Expert it is my opinion that HARVARD is under the influence of CNS Depressants and CNS Stimulants. Furthermore it is my opinion that he is under the influence to a degree that has impaired his ability to safely drive, operate or be in actual physical control of a motor vehicle." (ECF No. 37-

7 at 20-21).  Based on Beatty's opinion, Cesnalis included a driving under the influence ("DUI")

charge in the criminal complaint he was drafting.  Cesnalis Deposition at 70.

Beatty requested that Harvard consent to a blood test.  Harvard complied and was

transported to the hospital. CSMF ¶ 90.  In a comment on the evidence submission form for

Harvard's blood test, it was noted that Harvard was under the influence of crack cocaine.  (ECF

No. 37-7 at 14).  The officers requested that the crime lab perform an analysis for stimulant

suspected crack cocaine and analysis BAC%.

After the hospital, Harvard was returned to the barracks for a short period of time and

was transported to the Allegheny County Jail.  Cesnalis completed the Affidavit of Probable

Cause on April 20, 2015, in which Harvard was charged with aggravated assault, disorderly

conduct, reckless driving, driving under the influence of alcohol or a controlled substance,

simple assault and reckless driving.  In the Affidavit of Probable Cause, Cesnalis failed to

include any exculpatory evidence, including any statement from Mazzetti, any statement from

Harvard or the fact that Harvard called 911.  (ECF No. 41-3).

On May 19, 2015, the crime lab completed its report.  (ECF No. 37-7 at 23).  The

laboratory result on Harvard's blood alcohol level was 0.016%.  Harvard's blood test was

returned as "not detected" for all tested drugs.  (ECF No. 37-7 at 24).  On August 10, 2015, after

a preliminary hearing, a magistrate district judge dismissed the DUI charge.  All the other

charges were held for court.

On April 19, 2016, a nonjury trial was held on the remaining charges.  Sutton refused to

testify.  (Transcript, ECF No. 41-1 at 22).  Harvard's attorney argued that although this case

involved a "highly unusual factual scenario," without Sutton's testimony the prosecution could

not disprove beyond a reasonable doubt that Harvard acted in self-defense.  Transcript at 24, 45-46. Harvard was found not guilty on the remaining charges.

## III.    Procedural History

Harvard commenced this action on April 19, 2017.  (ECF No. 1.)  He asserts § 1983 claims for equal protection, reckless investigation, malicious prosecution, false arrest, false imprisonment and conspiracy.  Harvard asserted claims under Pennsylvania law, but in his response to the summary judgment motion he recognized that the officers are entitled to sovereign immunity and withdrew all his state law claims.  (ECF No. 40 at 18).    The government's motion for summary judgment on all remaining claims is now fully briefed and ripe for review.

## IV.    Standard of Review

Summary judgment may only be granted where the moving party shows that there is no genuine dispute as to any material fact, and that a judgment as a matter of law is warranted.  FED. R. CIV. P. 56(a).  Pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In evaluating the evidence, the court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor.  *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).  The burden is initially on the moving party to demonstrate that the evidence contained in the record does not create a genuine issue of material fact.  *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004).  A dispute is "genuine" if the evidence is such that a reasonable trier of fact could render a finding in favor of the nonmoving party.  *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d

Cir. 2005). Where the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the nonmoving party's burden of proof. *Celotex Corp.*, 477 U.S. at 322. Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue of material fact for trial. *Id.* at 324. The nonmoving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

## V.    Discussion

Defendants contend that Harvard failed to assert any viable § 1983 claims. They concede they are state actors, but argue that Harvard's constitutional rights were not violated. The court will address the claims seriatim.


### A.  Count 1:  Equal Protection claim

The purpose of the Equal Protection Clause of the Fourteenth Amendment is "to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). To establish a prima facie case of discrimination under the Equal Protection Clause, a plaintiff must establish: (1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." *Saucon Valley*

*Manor, Inc. v. Miller*, 392 F. Supp.3d 554, 583 (E.D. Pa. 2019) (citing *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006).

Persons are "similarly situated" under the Equal Protection Clause when they are alike "in all relevant aspects." *Startzell v. City of Phila.*, 533 F.3d 183, 203 (3d Cir. 2008). At the summary judgment stage, a plaintiff cannot rely on allegations or conclusory assertions of disparate treatment to satisfy their burden, but must produce evidence of similarly situated persons who were differently treated. *See Young v. Twp. of Coolbaugh*, 276 F. App'x 206, 209 (3d Cir. 2008).

Harvard argues that he was treated differently because of his race. He does not point to any caucasian drivers who drove at highway speeds with someone on the hood of the vehicle, but were not charged with crimes. Instead, Harvard argues that Sutton and he were similarly situated. (ECF No. 40 at 17). Harvard and Sutton, however, were <u>not</u> similarly situated in all relevant respects – Harvard was behind the steering wheel operating the vehicle and Sutton was hanging on to the hood.

Because Harvard failed to identify a valid comparator, his Equal Protection claim must fail.[4] Defendants are entitled to summary judgment on count 1.


B. Count 2: Reckless Investigation claim

It is unlikely that the United States Court of Appeals for the Third Circuit would recognize a § 1983 "reckless investigation" claim. *Johnson v. Logan*, 721 F. App'x 205, 208 n.9 (3d Cir. 2018) ("We note, without deciding, that we have significant doubts about whether there is an independent substantive due process right to be free from a reckless investigation."). In *Geness v. Cox*, 902 F.3d 344, 354 n.5 (3d Cir. 2018), the court of appeals expressed doubts about the

---

[4] Even crediting Harvard's testimony that Cesnalis used racially pejorative language in calling Harvard "boy," there is simply no evidence of disparate treatment to support an Equal Protection claim.

viability of such a claim in a precedential opinion, citing *Brooks v. City of Chicago,* 564 F.3d 830, 833 (7th Cir. 2009), for the proposition that plaintiffs cannot combine a false arrest claim with a state law malicious prosecution claim to make a hybrid substantive due process claim.

Assuming a reckless investigation claim is viable, the elements of the prima facie case are set forth in *Thomas v. Stanek*, No. 2:14-CV-1415, 2015 WL 757574, at *7 (W.D. Pa. Feb. 23, 2015): (1) a police officer acted intentionally or recklessly, (2) in a manner that shocks the conscience, (3) in failing to investigate. The alleged failure to investigate is considered in tandem with the strength or weakness of the probable cause evidence, so that if probable cause evidence is weak, officers may have a greater duty to consider potential exculpatory evidence." *Id.* (citations omitted). In *Geness*, the court explained that an officer need not "explore and eliminate every theoretically plausible claim of innocence," even if "an investigation might have cast doubt upon the basis for the arrest." 902 F.3d at 354 n.5 (quoting *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001)).

Harvard argues, in essence, that defendants are liable because they were racially biased and chose to believe Sutton rather than him. (ECF No. 40 at 14). The charges, however, did not depend on Sutton's credibility. The officers knew that Harvard drove at highway speeds with Sutton on the hood of his vehicle. Regardless of Harvard's justification for such conduct, the officers did not "shock the conscience" by charging him with reckless driving and reckless endangerment.

Cesnalis did investigate. He interviewed Harvard, Sutton and Mazzetti at the scene. Sutton told a conflicting story (i.e., that Harvard hit him with the vehicle and refused to let him off the hood). Cesnalis was not required to believe Harvard's version of events. *See Corliss v. Lynott*, No. 3:15-cv-01364, 2016 WL 625071, at *8 (M.D. Pa. Jan. 5, 2016) (an investigating officer is

not required to view facts through a particular prism that casts the evidence in the light most favorable to the accused). Cesnalis was unable to confirm Harvard's claims that Sutton had a knife and gun, he smelled alcohol on Harvard's breath and observed sweaty and excited behavior. Harvard admitted consuming alcohol earlier in the day. It took Harvard six tries to do the Breathalyzer test correctly and he scored 0.64, which is below the legal limit of 0.8. Cesnalis asked Beatty, a DRE, to perform a drug and alcohol examination.

Beatty performed a series of drug and alcohol tests and asked to Harvard to consent to blood tests. Harvard did not point to any misconduct by Beatty, other than including in his report Sutton's accusation, as relayed to Cesnalis, that Harvard was smoking crack cocaine as he drove. Harvard does not point to any evidence by which a jury could conclude that Beatty was reckless for including that accusation.[5] The record reflects that Beatty examined Harvard, confirmed that he had consumed alcohol that evening, observed numerous indicators of substance abuse, and sent him to the hospital for a drug test which came back negative. In sum, Harvard did not point to evidence from which a reasonable jury could find a reckless investigation by defendants under the facts and circumstances of this case.

The court in *Geness* explained that even if a reckless investigation claim was cognizable, the officers would be entitled to qualified immunity because no such constitutional right was "clearly established" at the relevant time. *Id.* (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Harvard argues that the right in this case was clearly established by the decision in *Whitley v. Allegheny County*, No. 07-403, 2010 WL 892207 (W.D. Pa. Mar. 9, 2010), which was affirmed in a "decision wholly without precedential value," 402 F. App'x 713, 714 (3d Cir. 2010). In *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011), the Supreme Court rejected reliance on a

---

[5] Arguably, defendants would have been reckless if they had <u>not</u> investigated that accusation.

district court decision and explained that in the absence of controlling authority, there must be "a robust consensus of cases of persuasive authority." *Id*. at 742.

No "robust consensus" exists regarding the circumstances of this case. *Whitley* did not establish a right to be free from reckless investigation with the requisite degree of specificity because it involved vastly different circumstances – a murder investigation in which there was a suspicious eyewitness identification, the accused's fingerprints did not match those at the scene and he did not have any scratches or marks on his body, the police were aware of other suspects, and they engaged in misuse of a photo array. *Whitley,* 2010 WL 892207 at *36-37. In this case, by contrast, there was no dispute about Harvard's identity and officers saw him drive with Sutton on the hood of his vehicle. The right to be free from reckless investigation under the circumstances of this case was not, therefore, clearly established.

For all these reasons, (i.e., the claim is not recognized, the evidence fails to demonstrate a reckless investigation that shocks the conscience, and qualified immunity) defendants are entitled to summary judgment on count 2.

C. Counts 3, 4 and 5: Malicious Prosecution, False Arrest and False Imprisonment claims

The Fourth Amendment protects against unreasonable seizures of the person. The parties agree that lack of probable cause is an essential element of each of the claims for false arrest, false imprisonment and malicious prosecution. To state a claim for false arrest under the Fourth Amendment, a plaintiff must establish: (1) that there was an arrest; and (2) that the arrest was made <u>without probable cause</u>. *Groman v. Township of Manalapan*, 47 F.3d 628, 634 (3d Cir. 1995) (emphasis added). If the police <u>lack probable cause</u> to make an arrest, the arrestee also has a claim for false imprisonment based on a detention pursuant that arrest. *Id*. at 636. The elements of a malicious prosecution are: (1) the defendants initiated a criminal proceeding; (2)

the criminal proceeding ended in plaintiff's favor; (3) the proceeding was initiated <u>without</u> <u>probable cause</u>; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding. *Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003) (emphasis added). If probable cause existed, each of these claims must fail as a matter of law.

In a recent case involving a warrantless arrest, *United States v. Johnson*, No. 2:17-CR-00243, 2019 WL 5288015 (W.D. Pa. Oct. 18, 2019), the court summarized the applicable probable cause test:

> Warrantless arrests must be based on probable cause. *Draper*, 358 U.S. at 310–11. Probable cause requires that at the time of arrest, the facts and circumstances within the knowledge of the arresting agents, and of which they have reasonably trustworthy information, are sufficient to warrant a prudent individual in believing that the arrestee had committed or is committing an offense. *Beck v. Ohio*, 379 U.S. 89, 91 (1964). The probable cause inquiry requires a totality-of-the circumstances analysis as to whether a fair probability existed that a crime had been or was being committed by the arrestee. *Gates*, 462 U.S. at 246.

*Id.* at *10.

In *Wright v. City of Philadelphia*, 409 F.3d 595, 602 (3d Cir. 2005), the court of appeals emphasized that the officer's belief of a suspect's guilt need only be reasonable, as opposed to certain, and that the evidentiary standard for probable cause is significantly lower than that required for conviction. The court also emphasized that probable cause to arrest may exist as to any offense that could be charged under the circumstances. *Id.*

In this case, Cesnalis had probable cause to arrest Harvard for committing numerous crimes. Specifically, there was a common sense, reasonable basis to believe that Harvard violated the following laws:

(1) The crime of recklessly endangering another person is defined as follows: "A person commits a misdemeanor of the second degree if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury." 18 Pa. Cons. Stat. § 2705.

(2) The summary offense of reckless driving is defined as follows: "Any person who drives any vehicle in willful or wanton disregard for the safety of persons or property is guilty of reckless driving." 75 Pa. Cons. Stat. § 3736. "A member of the Pennsylvania State Police who is in uniform may arrest without a warrant any person who violates any provision of [the motor vehicle code] in the presence of the police officer making the arrest." 75 Pa. Cons. Stat. § 6304(a).

(3) A person is guilty of simple assault if he, among other things: "(1) attempts to cause or intentionally, knowingly or recklessly causes bodily injury to another; (2) negligently causes bodily injury to another with a deadly weapon; [or] (3) attempts by physical menace to put another in fear of imminent serious bodily injury." 18 Pa. Cons. Stat. § 2701.

(4) A person is guilty of aggravated assault if he, among other things: "(1) attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life; (2) attempts to cause or intentionally, knowingly or recklessly causes serious bodily injury to any of the officers, agents, employees or other persons enumerated in subsection (c) or to an employee of an agency, company or other entity engaged in public transportation, while in the performance of duty; (3) attempts to cause or intentionally or knowingly causes bodily injury to any of the officers, agents, employees or other persons enumerated in subsection (c), in the performance of duty; [or] (4) attempts to cause or intentionally or knowingly causes bodily injury to another with a deadly weapon." 18 Pa. Cons. Stat. § 2702.

Pennsylvania law is clear that simple assault and aggravated assault may be committed with a motor vehicle. *See, e.g., Commonwealth v. Akhmedov*, 216 A.3d 307, 323 (Pa. Super. Ct. 2019) (affirming conviction for aggravated assault by vehicle); *Commonwealth v. Robinson*, No. 2785 EDA 2015, 2017 WL 679923, at *2 (Pa. Super. Ct. Feb. 21, 2017) (involving convictions for aggravated assault and simple assault by vehicle).

(5) A person commits "disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he: (1) engages in fighting or threatening, or in violent or tumultuous behavior; . . . or (4) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor." 18 Pa. Cons. Stat. § 5503(a).

(6) A person can violate the DUI of alcohol statute in two ways:

(1) "An individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the individual is rendered incapable of safely driving, operating or being in actual physical control of the movement of the vehicle." 75 Pa. Cons. Stat. § 3802(a)(1).

(2) "An individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the alcohol concentration in the individual's blood or breath is at least 0.08% but less than 0.10% within two hours after the individual has driven, operated or been in actual physical control of the movement of the vehicle." 75 Pa. Cons. Stat. § 3802(a)(2).

(7) A person can also violate the DUI statute if he was "under the combined influence of alcohol and a drug or combination of drugs to a degree which impairs the individual's ability to safely drive, operate or be in actual physical control of the movement of the vehicle." 75 Pa. Cons. Stat. § 3802(d)(3).

Cesnalis possessed trustworthy information that Harvard drove for ten miles, at highway speed, with a man on the hood of his vehicle. Cesnalis smelled alcohol on Harvard's breath and observed his excited and sweaty conduct. Harvard admitted to having some alcohol earlier in the evening. Harvard's claim that Sutton threatened him with a cinder block, knife and gun could not be confirmed with physical evidence. Even viewed in the light most favorable to Harvard and regardless of Sutton's behavior, Harvard's conduct was, by any definition, reckless and endangering to another person. Harvard's conduct posed a great distraction and danger to other motorists. If Sutton would have fallen off the vehicle, he would have suffered severe injury or death.

Cesnalis had probable cause to charge Harvard with DUI. Beatty, a DRE, performed an evaluation and opined that Harvard was under the influence of drugs and alcohol that impaired his ability to operate a motor vehicle. Officers are permitted to rely on the reports of other officers when determining whether probable cause was present. *Tavernaris v. City of Beaver Falls, PA*, No. CIV.A. 07-127, 2008 WL 2571469, at *2 (W.D. Pa. June 25, 2008). At the time

Cesnalis filed the DUI charge, the lab results were not known. More importantly, the DUI statute can be charged based on "general impairment," under 75 Pa. Cons. Stat. §§ 3802(a)(1) and (d)(3), rather than the legal limit set forth in § 3802(a)(2). *See Com. v. Leber*, No. 1862 MDA 2015, 2016 WL 1615561, at *2 (Pa. Super. Ct. Apr. 21, 2016) ("Unlike the other subsections of DUI, general impairment does not require proof that the accused had a blood alcohol level in excess of the legal limit."). Harvard admitted to alcohol use earlier in the day and tested 0.64 on the Breathalyzer test. Based on the circumstances of the incident, the officers had a reasonable basis to believe that alcohol or drugs impaired Harvard's ability to safely operate his vehicle.

The officers, in sum, had a reasonable basis to believe that Harvard committed multiple crimes. A state court ratified the existence of probable cause at the preliminary hearing, because all charges except for the DUI charge were held over for trial. *Corliss*, 2016 WL 625071, at *8 at 8 n.8 ("While evidence of a holding over is not conclusive as to probable cause, an independent determination of probable cause, which was established at the preliminary hearing, constitutes weighty evidence of probable cause."). Because there was probable cause to arrest Harvard, the false arrest and false imprisonment claims fail as a matter of law.

The malicious prosecution claim merits a further explanation. In *Kossler v. Crisanti*, 564 F.3d 181, 193 (3d Cir. 2009), the court of appeals noted that considerable tension exists in the treatment of the probable cause element of a malicious prosecution claim between *Wright*, 409 F.3d at 595, and *Johnson v. Knorr*, 477 F.3d 75 (3d Cir.2007). In *Wright*, the court determined that the existence of probable cause for the arrest—stemming from the existence of probable cause for at least one charge—precluded the plaintiff from proceeding with her malicious prosecution claim with respect to any of the charges brought against her. *Kossler*, 564 F.3d at

193–94.  By contrast, in *Johnson*, the court stated that "a defendant initiating criminal proceedings on multiple charges is not necessarily insulated in a malicious prosecution case merely because the prosecution of one of the charges was justified."  477 F.3d at 85.

The *Johnson* court expressly stated that the precedential status of *Wright* was not diminished. 477 F.3d at 82 n. 9.  In *Kossler*, the court recognized that if the decisions cannot be reconciled, *Wright* is the controlling authority because it is the earlier decision.  564 F.3d at 194 n.8.  In this case, all the charges arose out of the original incident and Cesnalis had probable cause to assert every charge.  The court need not, therefore, reconcile the *Wright* and *Johnson* decisions.

To the extent that a conflict exists,[6] this court views the factual situation in *Wright* as analogous and instructive.  The accused in that case (Wright), like Harvard in this case, provided a compelling justification for her conduct.  She re-entered a residence to retrieve her clothes and took items to prove that she was sexually assaulted.  She was charged with criminal trespass and burglary; the charges were eventually dismissed; and she filed § 1983 false arrest and malicious prosecution claims against the charging officers.  409 F.3d at 602.  Wright admitted to police that she broke a small windowpane, entered the home, and left with bags containing various items from the residence including wine, watches, clothes, and other items that were unlikely to help the police identify her attackers. The court explained that although an accused's explanation is a factor in the probable cause analysis, it is not dispositive. The court of appeals held that the officers had probable cause and stated:

---

[6] In *Kollock-Mann v. Morante*, Civ. Action No. 15-4708, 2017 WL 772326, at *3 (D.N.J. Feb. 28, 2017), the court found that the decisions could be reconciled and explained:  "*Wright* applies to factual scenarios involving more discreet involvement by law enforcement. *See Johnson*, 477 F.3d at 84 ("in *Wright* the defendants had probable cause to arrest the plaintiff in the first place, and their involvement apparently ended at the time of the arrest."). In contrast, where, as alleged here (and as in *Johnson*) the Defendants' "involvement in both the arrest and the initiation of criminal proceedings ... [is alleged to be] more extensive and lasted beyond the issuing of an affidavit of probable cause for [plaintiff's] arrest and the arrest itself," *id.*, the existence of probable cause as to one crime charged does not "insulate [Defendants] from liability" for malicious prosecution with respect to the other charged crimes. *Id.*

> The probable cause inquiry looks to the totality of the circumstances; the standard does not require that officers correctly resolve conflicting evidence or that their determinations of credibility, were, in retrospect, accurate. The officers did not believe Wright's explanation for her entry. Although they may have made a mistake, their belief was not unreasonable in light of the information the officers possessed at the time.

409 F.3d at 603. The same analysis applies here. Although the charges against Harvard were eventually dismissed at trial after Sutton refused to testify,[7] the officers had probable cause to file charges against him.

Even though Harvard provides sympathetic reasons for his conduct,[8] no reasonable jury could find the absence of probable cause under these circumstances. Defendants, therefore, are entitled to summary judgment on counts 3, 4 and 5. The court need not consider the other elements of those claims.

D. Count 6: Civil Conspiracy claim

The elements of a § 1983 civil conspiracy claim are: (1) the existence of a conspiracy involving state action; and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy. *Eichelman v. Lancaster Cty.*, 510 F. Supp. 2d 377, 392 (E.D. Pa. 2007). As explained in *Hamborsky v. O'Barto*, 613 F. App'x 178, 182 (3d Cir. 2015), if the other § 1983 claims fail, the conspiracy claim must also fail. An underlying violation of the plaintiff's constitutional rights is a prerequisite for conspiracy liability. *Id.* (citing *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 193 F.3d 781, 789 (3d Cir.1999) ("civil conspiracy requires a separate underlying tort as a predicate for liability")). For the reasons set forth above, defendants are entitled to summary judgment on counts 1-5; therefore, defendants are also entitled to summary

---

[7] There was no evidence to counter Harvard's claim of self defense. (ECF No. 41-1 at 45).
[8] In light of the blood test results, although Harvard had consumed alcohol earlier in the day, his behavior at the scene and during Beatty's evaluation may be attributable to the fact that he experienced a traumatic incident.

judgment on the conspiracy claim in count 6.  The court notes that the evidentiary record fails to support an agreement between Cesnalis and Beatty to violate Harvard's constitutional rights.

## VI.    Conclusion

For the foregoing reasons, defendants' motion for summary judgment will be granted. An appropriate order follows.

By the court:

<u>/s/ Joy Flowers Conti</u>
Joy Flowers Conti
Senior United States District Judge

Dated:  December 4, 2019

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**DWAYNE HARVARD**,        )
                          )
     Plaintiff,            )
                          )
        v.                )     Civil Action No. 17-505
                          )
**CHRISTOPHER J. CESNALIS**  )
*Individually and* **DANIEL L. BEATTY**  )
*Individually,*             )
                          )
     Defendants.         )

## <u>ORDER</u>

AND NOW this 4th day of December, 2019, for the reasons set forth in the accompanying memorandum opinion, IT IS HEREBY ORDERED that defendants' motion for summary judgment (ECF No. 34) is **GRANTED**.  The case will be marked closed.

BY THE COURT:

*/s/ Joy Flowers Conti*
Joy Flowers Conti
Senior United States District Judge